# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **CHRISTIAN B. CHAPMAN,** | : |
| Plaintiff, | : |
| v. | : **Case No.:** 1:17-cv-3719-SAG |
| **MINA MANUHEHRI,** | : |
| Defendant. | : |

# MEMORANDUM OPINION

Following an auto-pedestrian accident, Plaintiff Christian B. Chapman filed this lawsuit against Defendant Mina Manuhehri, alleging negligence. ECF 4. On May 8, 2019, Defendant filed a Motion in Limine to exclude Plaintiff's designated expert, Dr. Thomas Garzillo, from testifying regarding Plaintiff's future medical expense and future lost wage claims. ECF 83. After the May 13, 2019 Pretrial Conference, the Court indicated its intent to hold a *Daubert* hearing as to the reliability and sufficiency of Dr. Garzillo's testimony. ECF 88. On May 17, 2019, Defendant filed another Motion in Limine to Exclude Opinion Testimony of Thomas Garzillo. ECF 98. On May 20, 2019, the Court held a *Daubert* hearing to determine the admissibility of Dr. Garzillo's testimony. ECF 104. After the hearing, the Court granted Defendant's May 8, 2019 Motion in Limine, ECF 83, excluding Dr. Garzillo from testifying at trial as an expert witness. This Opinion explains the basis for that ruling. Also, for the reasons stated below, the Court denies as untimely Defendant's May 17, 2019 Motion to Exclude Opinion Testimony of Thomas Garzillo, ECF 98.

## I. BACKGROUND

This case arises from an auto-pedestrian accident on February 8, 2017 in Montgomery Village, Maryland, where Defendant's vehicle struck Plaintiff, a pedestrian. ECF 4. On November 28, 2018, Defendant admitted that she was negligent and that her negligence was the sole cause of the accident. ECF 66. The case proceeded to trial on the issue of damages only. *Id.*

### a. Procedural History

On June 26, 2018, the case was referred to this Court for all proceedings, by consent of the parties. ECF 54, 57, 63. The Court held a telephone status conference on December 21, 2018, setting April 25, 2019 as the deadline for submitting the pretrial order, motions in limine, proposed voir dire questions, jury instructions, and special verdict forms, and confirming a May 13, 2019 Pretrial Conference date and a May 20, 2019 trial date. ECF 69. Plaintiff submitted his pretrial documents two weeks before the deadline, on April 11, 2019. ECF 70, 71, 72, 73. On April 18, 2019, Plaintiff requested a conference, seeking a continuance of the May 20, 2019 trial date because Plaintiff's counsel had not had "the opportunity to fully investigate the medical nature of [Plaintiff's] ongoing left knee pain." ECF 74 ¶¶ 11, 12. To determine whether a continuance of the May 20, 2019 trial date was necessary, the Court held a status conference on April 24, 2019. ECF 75. As a result of that conference, the Court directed Plaintiff's counsel to provide a written status update within 48 hours of Plaintiff's upcoming appointment with his new physician the following week, and to advise of any referrals made by the physician and the date of any future medical appointments. *Id.*

On April 26, 2019, Plaintiff submitted a status report, noting that Plaintiff's primary care physician had referred him for a neurology consult. ECF 76. On April 30, 2019, the Court ordered Plaintiff's counsel to provide a written update by May 3, 2019, with the date of Plaintiff's neurologist appointment. ECF 77. On the same day, Plaintiff submitted a notice that his neurologist appointment was May 3, 2019. ECF 78. After the appointment, Plaintiff submitted a notice that he was seen by "Onasanya, Olukayoda, M.D.," who ordered an EMG for further diagnosis. ECF 79. Subsequently, on May 3, 2019, the Court ordered Plaintiff's counsel to provide a written update on May 6, 2019, with the date of Plaintiff's EMG appointment. ECF 80. The Court also revised the deadline for Defendant's pretrial order, motions in limine, proposed voir dire questions, proposed jury instructions, and proposed verdict forms to May 8, 2019. *Id.* On May 6, 2019, Plaintiff provided the neurologist's report, but did not yet have a scheduled date for Plaintiff's EMG appointment. ECF 81. The neurologist's report reflected a neurological examination that was "normal without any objective motor or sensory dysfunction in the left leg as compared to the right leg." ECF 81-1 at 6.

In light of the new information, the Court held another conference call on May 7, 2019, confirming that the two-day jury trial set for May 20, 2019 would remain as scheduled. ECF 82. The Court also noted that counsel for Plaintiff would be permitted to attend the Pretrial Conference scheduled for May 13, 2019, by telephone. *Id.* On the due date of May 8, 2019, pursuant to the Court's May 3, 2019 Order, ECF 80, Defendant submitted her Motion in Limine to preclude from evidence any testimony from Dr. Garzillo on Plaintiff's future medical expense and future lost wage claim. ECF 83.

The Court held the Pretrial Conference on May 13, 2019, with Plaintiff's counsel attending by telephone. The Pretrial Conference resolved some of the issues raised in Defendant's Motion,[1] but a dispute remained as to whether Dr. Garzillo was qualified to provide an opinion at trial regarding Plaintiff's future medical expenses. The Court advised the parties of its intent to conduct a *Daubert* hearing before trial on May 20, 2019, to determine the reliability and sufficiency of Dr. Garzillo's testimony. Following the Pretrial Conference, counsel first provided the Court with a copy of Dr. Garzillo's March 9, 2018 Report, along with the underlying records Dr. Garzillo had reviewed concerning Plaintiff's case.

Upon review of those items, the Court submitted a letter to the parties on May 13, 2019, expressing concern about the methodology Dr. Garzillo had used to determine Plaintiff's future medical expenses, and the overall reliability and sufficiency of Dr. Garzillo's testimony as an expert in this case. ECF 88. The Court "wanted to share its tentative views in advance, because of the expense involved in bringing Garzillo from Texas to Maryland for the proceedings." *Id.* at 3. The Court also noted its continued willingness to consider a written submission from Plaintiff as to the admissibility of the testimony, or to hold a *Daubert* hearing as planned. *Id.*

On May 17, 2019, Plaintiff submitted a letter to the Court, prepared and signed by Dr. Garzillo, responding to the Court's May 13, 2019 letter, and appending the exhibits he had relied upon in his expert report. ECF 95, 96. The Court responded with a letter confirming the pretrial and trial procedures, noting that it remained willing to hold a *Daubert* hearing to permit Plaintiff

---

[1] Defendant had objected to Plaintiff calling Dr. John Arnold as an expert witness, because he had not been so identified. ECF 83. At the Pretrial Conference, Plaintiff represented that he would not seek to call Dr. Arnold. Plaintiff also clarified that he would not ask Dr. Garzillo to provide testimony as to future lost wages, and would not seek to recover that category of damages.

an opportunity to address the Court's concerns regarding Dr. Garzillo's testimony. ECF 97. The same day, Defendant filed another Motion in Limine to preclude Dr. Garzillo's testimony regarding both past medical expenses and any future damages. ECF 98. Later that day, Plaintiff filed an Emergency Motion Withdrawing Consent to Vacate Referral to Magistrate and to Stay Proceedings to allow review by the United States District Judge. ECF 99. On May 20, 2019, United States District Judge George L. Russell III held a hearing on Plaintiff's Emergency Motion. ECF 103. Judge Russell denied Plaintiff's Motion, and directed the parties to proceed with trial before this Court. ECF 102. The same day, this Court held a *Daubert* hearing, during which Dr. Garzillo testified as to the bases for his opinions. ECF 104. After the hearing, the Court issued its ruling, excluding Dr. Garzillo's testimony. *Id.*; Daubert Tr. at 56-59. The two-day jury trial concluded on May 21, 2019, with the jury finding in favor of Plaintiff and awarding $3,000 in non-economic damages. ECF 106, 112, 113.

### b. Dr. Thomas Garzillo's Expert Report,[2] Supplemental Letter,[3] and *Daubert* Testimony

Dr. Garzillo is a licensed Doctor of Chiropractic in Texas, and is also a Certified Life Care Planner. Exhibit A at 2. Plaintiff retained Dr. Garzillo as an expert "to present the reasonable medical probability for a 'jury charge of consideration of future medical expenses as well as

---

[2] Dr. Garzillo's expert report was provided to the Court at the Pretrial Conference by Defendant's counsel for consideration with Defendant's Motion in Limine, ECF 83, but the report was not officially appended as an exhibit to that motion, nor was it entered as an exhibit at the *Daubert* hearing. To complete the record in this case, the Court is attaching Dr. Garzillo's expert report as Exhibit A to this Opinion.

[3] Dr. Garzillo submitted a supplemental written report on May 17, 2019, in response to the Court's May 13, 2019 letter, and appended all of the sources he had relied upon. ECF 95, 96. His supplemental report, and Exhibits 1 through 17, were admitted as exhibits at the *Daubert* hearing. Daubert Tr. at 47-48.

associated costs and losses' in ligitation on behalf of" Plaintiff. *Id.* (emphasis removed). Dr. Garzillo's expert report, "Plan of Anticipated Future Medical Expenses along with a Narrative Report of Prognosis for Christian Chapman," includes a prognosis for Plaintiff's injury and an "accounting of his anticipated future care and costs." *Id.* In his report, Dr. Garzillo states that he relied on medical and/or billing records obtained from: Gabriel Gluck, MD; Johns Hopkins Medicine/Suburban Hospital; Montgomery County Fire and Rescue; and Piedmont Physical Therapy. *Id.* at 3.

Of the sixteen pages that make up his report, Dr. Garzillo devotes roughly only three pages to actual analysis of Plaintiff's condition, while the remainder of the report provides pages of references to the Texas Rules of Evidence, as well as a list of scholarly articles on pain, ranging in date from 1971 to 2014. Exhibit A. Dr. Garzillo provides two Tables, Table A, summarizing the cost of anticipated future care for chronic pain, and Table B, summarizing the anticipated future care and diagnostic testing for chronic pain. *Id.* at 8-9. Table A provides an anticipated cost of $4,500 per year for Plaintiff's future care, a number derived from a 2011 study funded by the National Institutes of Health, titled "Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research" ("the NIH Study"). *Id.* at 8. Based on a life expectancy of 49 years from age 27 to age 76, Table A calculates an anticipated total cost of $220,500 for Plaintiff's future care. *Id.* at 2, 8. Table B provides a list of twelve types of possible future treatment for Plaintiff's pain, from massage therapy to MRI or CT scans, but Dr. Garzillo notes that he believes Plaintiff's "future care will include some but may not include all of the care listed, and his future care may not be limited to only the care listed." *Id.* at 9. Dr. Garzillo also included the Short-Form McGill Pain Questionnaire 2 ("SF-MPQ-2") that he administered over

6

the phone with Plaintiff, with additional notes assessing Plaintiff's activities of daily living and quality of life, based only on Plaintiff's answers over the phone. *Id.* at 10-13.

Dr. Garzillo's supplemental letter, submitted well after Plaintiff's Rule 26(a)(2) disclosures were due, did not provide additional analysis of Plaintiff's condition, but referenced additional scholarly studies, and explained the scope of chiropractic practice permitted in North Carolina and Texas.[4] ECF 95; *see also* ECF 51 (scheduling order setting October 29, 2018 as the discovery deadline).

At the *Daubert* hearing, Dr. Garzillo testified that, before writing his report, he had only spoken with Plaintiff on the phone, and had not met with him in person.[5] Daubert Tr. at 26:19-21. He testified that he had reviewed Plaintiff's medical records reflecting that Plaintiff had suffered a fracture of his left tibial plateau. *Id.* at 22. He stated that "the location of this particular fracture, the fracture of the tibial shelf is problematic in and of itself." *Id.* at 24:4-6. He also noted that he had not seen a fracture of this nature "that often." *Id.* at 24:9. Dr. Garzillo testified that, during his telephone conversation with Plaintiff, he used the SF-MPQ-2 assessment, using "22 words that describe different types of pain with the goal being that rating each particular pain gives you some sort of check and balance system as to what the level of pain is and how you

---

[4] This Court's May 13, 2019 letter contemplated a submission on the *Daubert* challenge from Plaintiff's attorneys, and did not invite an amended expert report from Dr. Garzillo.

[5] At the *Daubert* hearing, Dr. Garzillo testified that he had physically observed Plaintiff for the first time the night before the hearing. Daubert Tr. at 43-44. The Court sustained Defendant's objection to that testimony, because Dr. Garzillo's apparent examination of Plaintiff the night before trial was not within the scope of Dr. Garzillo's properly disclosed expert testimony, pursuant to Rule 26(a). *Id.*; *see Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014) ("The purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise.").

can quantify that level of pain a little bit more objectively." *Id.* at 29:2-6. He also spoke with Plaintiff's parents, who discussed the "way [Plaintiff] walked, the way [Plaintiff] moved," and that Plaintiff "did not have the same life that he did before the wreck." *Id.* at 27:23-28:1. When asked what type of pain Plaintiff described, Dr. Garzillo responded, "[v]arious types of pain that I think would be consistent with the level of nerve, the level of joint, some aspects of the level of muscle spasm but more so what you typically find in a joint extremity situation." *Id.* at 33:18-21.

Dr. Garzillo also testified about the NIH study, the source of the $4,500 figure he included in his report. *Id.* at 40. He stated, "[the report] says: Adults with pain reported higher healthcare expenditures than adults without pain, based on the SF-12 pain measures which is a different assessment," than the SF-MPQ-2 assessment Dr. Garzillo had used to assess Plaintiff's pain. *Id.* at 41:12-14. He explained that the NIH study concluded that "[a] person with moderate pain has healthcare expenditures $4,516 higher than those of someone with no pain." *Id.* at 41:14-16. To determine the severity of Plaintiff's pain, Dr. Garzillo used the SF-MPQ-2 test, which "goes through the answer to each question. [Plaintiff] answers the question from zero to 10. Basically do the math to see on average where those numbers fall and on average which quadrant that would put him in with a range, for example, of moderate pain being 5.1 to 7.5." *Id.* at 42:1-6. Based on this assessment, Dr. Garzillo found that Plaintiff's pain was "moderate," and, consequently, the study he used "says what the healthcare expenditures for moderate pain are likely to be," which Dr. Garzillo rounded to $4,500. *Id.* at 41-42. When asked whether the NIH study he relied upon from 2011, based on data from 2008, would still be considered accurate, Dr. Garzillo testified that he had "no information of its accuracy or inaccuracy." *Id.* at 45:11.

On cross-examination, Dr. Garzillo stated that he had reviewed Plaintiff's treating physician's records, which noted "no complaints of pain," a normal exam of the leg. *Id.* at 49, 53. He acknowledged that neither of Plaintiff's orthopedic surgeons had indicated that Plaintiff may have a permanent problem requiring future treatment. *Id.* Dr. Garzillo also noted that he could not itemize any specific costs for Plaintiff's treatment, or specify the treatment Plaintiff would obtain in the future. *Id.* at 51. Finally, Dr. Garzillo confirmed that, to his knowledge, Plaintiff had never been treated by a chiropractor. *Id.* at 52:12-14.

## II. LEGAL STANDARD

"The admissibility of expert testimony in a federal court sitting in diversity jurisdiction is controlled by federal law." *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1054 (4th Cir. 1986). Under the Federal Rules of Evidence, a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Expert testimony is admissible if it will assist the trier of fact, and: (1) is "based on sufficient facts or data;" (2) is "the product of reliable principles and methods;" and (3) the principles and methods have been applied "reliably … to the facts of the case." *Id.* The expert testimony also must rest on a reliable foundation and must be relevant. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (extending *Daubert* to "the testimony of … other experts who are not scientists"). Where experiential expert testimony "does not rely on anything like a scientific method," it is nevertheless admissible "so long as an experiential witness 'explain[s] how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the

opinion, and how [his] experience is reliably applied to the facts.'" *United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010) (alterations in original) (citations omitted).

The Court's inquiry into the reliability of an expert's testimony is "flexible," and focuses on "the principles and methodology employed by the expert." *Daubert*, 509 U.S. at 594-95, 113 S. Ct 2786; *see also Holesapple v. Barrett*, 5 F. App'x 177, 179 (4th Cir. 2001). In determining whether proffered testimony is sufficiently reliable, "the court has broad lattitude to consider whatever factors bearing on validity the court finds to be useful; the particular factors will depend on the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Neither *Daubert* nor the Federal Rules of Evidence obligate a trial court "to admit opinion evidence that is [based merely on] the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Rather, "[r]eliability is to be determined by the 'principles and methodology' employed by the expert." *Holesapple*, 5 F. App'x at 179. Indeed, "[t]he Court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury." *Goyal v. Thermage, Inc.*, Civil No. WDQ-08-0020, 2011 WL 691185, at *3 n.8 (D. Md. Feb. 18, 2011) (quoting *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004)).

### III. ANALYSIS

As the Court stated in its May 20, 2019 ruling at the *Daubert* hearing, Dr. Garzillo's opinions fall short of the requirements of Federal Rule of Evidence 702 and the *Daubert* standard.[6]

---

[6] At the *Daubert* hearing, Plaintiff argued that Defendant's Motion was untimely and did not provide a proper foundation for her objection to Plaintiff's expert. Daubert Tr. at 2. As stated on the record at the hearing, Defendant timely objected to Dr. Garzillo's testimony in her May 8, 2019 Motion in Limine, ECF 83, pursuant to the Court's scheduling order. *Id.* at 3; *see* ECF 80 (Paperless Order setting May 8, 2019 as the deadline for motions in limine). Accordingly, the

Daubert Tr. at 56-59. The Court identified three bases to find that Dr. Garzillo's testimony was not the product of reliable principles and methods: (1) Dr. Garzillo's testimony that he used a different pain assessment method than the one used in the study providing his exclusive basis for calculating Plaintiff's future medical expenses; (2) the lack of reliable indicators in the study used by Dr. Garzillo to calculate Plaintiff's future medical expenses; and (3) Dr. Garzillo's failure to examine Plaintiff in person. *Id.*

First, Dr. Garzillo's method to assess Plaintiff's pain for the purpose of calculating his future medical costs lacks objective, independent validation. To satisfy Rule 702's "reliability" prong, expert testimony "must be supported by appropriate validation." *Daubert*, 509 U.S. at 590; *Kumho Tire Co.*, 526 U.S. at 149. Dr. Garzillo testified that the SF-MPQ-2 test he used to assess Plaintiff's pain was "amongst the most commonly used," according to one of his cited references. Daubert Tr. at 29:15-16. The referenced study states that the "SF-MPQ-2 demonstrated excellent

---

Court exercised its gatekeeping function to review Dr. Garzillo's testimony under Rule 702, which "like other determinations of admissibility of evidence, requires the trial judge to exercise an informed and broad discretion." *See Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199-200 (4th Cir. 2001); *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); Fed. R. Evid. 104(a)); *see also Kumho Tire Co.*, 526 U.S. at 149 (when expert testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question … the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'") (quoting *Daubert*, 509 U.S. at 592) (internal citations omitted); Daubert Tr. at 56-59. Although the Fourth Circuit has not opined on whether a trial judge is required to assess a proffered expert's testimony absent an objection, other circuits have found that "*Daubert* does instruct district courts to conduct a preliminary assessment of the reliability of expert testimony, even in the absence of an objection." *See Hoult v. Hoult*, 57 F.3d 1, 4 (1st Cir. 1995); *see also United States v. Locascio*, 6 F.3d 924, 938-39 (2d Cir. 1993) ("The district judge, who has the ideal vantage point to evaluate an expert's testimony during trial, already has the authority under Fed. R. Evid. 403 to conduct an explicit trustworthiness analysis should she deem one necessary."). However, Defendant's May 17, 2019 Motion in Limine, ECF 98, was filed after the deadline for Motions in Limine, and is denied as untimely.

11

reliability and validity in a sample of U.S. veteran patients with chronic neuropathic and non-neuropathic pain." ECF 95-1 at 1. However, the Court's concern was not whether the SF-MPQ-2 test itself is reliable, but whether using the results of that pain test to calculate an amount of money to be expended on future pain treatment is reliable. Dr. Garzillo expressly testified that the NIH study he used to calculate Plaintiff's future pain costs used a "different assessment" of moderate pain, before concluding that a "person with moderate pain has health care expenditures $4,516 higher than those of someone with no pain." Daubert Tr. at 41:14-16 (quoting ECF 95-4 at 327).

Indeed, the NIH study used the "SF-12" pain test to assess its subjects' pain, not the SF-MPQ-2 pain test Dr. Garzillo administered to Plaintiff. 95-4 at 327. Dr. Garzillo provided no information or evidence suggesting whether a finding of "moderate pain" on SF-12 is equivalent to a finding of "moderate pain" on SF-MPQ-2. The Court did not accept Dr. Garzillo's methodology because it differed from that used in the NIH study to calculate the $4,500 future pain cost, without any independent basis for validation. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proferred."); *Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340-41 (D. Md. 2011) ("'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert'") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146).

Second, the Court found that the NIH study Dr. Garzillo used to calculate Plaintiff's future expenses was not intended to be a tool for calculating any particular patient's future medical costs. The cited purpose of the study was "to address the current state of the science with respect to pain

research, care, and education; and explore approaches to advance the field." ECF 95-4 at 39. Although it set forth some general averages for health care expenditures in certain categories, the NIH study specifically noted that various other factors affect a patient's future expenditures, such as gender, income, education, age, and race. *Id.* at 327-28. Moreover, Plaintiff did not cite, nor has this Court found, any other examples of an expert witness using this particular 2011 report, which relied on data from 2008, as the sole methodology for calculating a patient's future medical expenses. The study itself delineates its limitations, including, most notably, that the study was a "cross-sectional analysis, so [the authors] cannot infer causality," and that the authors "cannot estimate the impact of pain associated with musculoskeletal conditions." *Id.* at 332. Even assuming the calculations in the study were accurate at the time, eight years later there have been advances in pain management techniques and changes in overall medical costs. Importantly, when asked whether the NIH study would still be considered accurate, Dr. Garzillo testified that he had "no information of its accuracy or inaccuracy." Daubert Tr. at 45:11-12. Thus, this Court is unable to accept Dr. Garzillo's methodology of using the 2011 NIH study as a sole measure to calculate or estimate Plaintiff's future medical expenses, because his methodology lacks appropriate validation. *See Daubert*, 509 U.S. at 590; *Kumho Tire Co.*, 526 U.S. at 149.

Finally, Dr. Garzillo's failure to physically examine Plaintiff before writing his report reveals the lack of sufficient facts or data for his opinions, particularly in light of the other evidence reviewed by Dr. Garzillo and presented at the hearing. While Dr. Garzillo testified that he physically observed Plaintiff the night before the hearing, the Court sustained Defendant's objection, because Dr. Garzillo's examination of Plaintiff the night before trial was not properly within the scope of Dr. Garzillo's expert testimony. Daubert Tr. at 43-44. Plaintiff argued that

13

Dr. Garzillo could testify regarding information made known to him "at or before the time of trial." *Id.* at 44:6-10. While Rule 703 allows an expert to testify on the "facts or data" that the expert "has been made aware of or personally observed," including at trial, Dr. Garzillo's examination of Plaintiff occurred before trial, but was not properly disclosed as a basis for his expert opinion pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) and (D).[7] Thus, the only testimony Dr. Garzillo could offer about Plaintiff derived from one telephone conversation, and the records he had reviewed before writing his expert report. Daubert Tr. at 49, 53.

Dr. Garzillo's testimony served to undermine, not support, his findings. He testified that, after asking Plaintiff questions about his pain based on the SF-MPQ-2 pain assessment, he determined that Plaintiff's pain was "moderate." Daubert Tr. at 41. He also testified that the only other bases for his opinions were Plaintiff's emergency room and ambulance records, the records from Dr. Gluck, and the records from Plaintiff's fourteen physical therapy visits. *Id.* at 49:5-10. The latest date of treatment in those records was June 12, 2017, almost two years before trial. Despite Dr. Garzillo's finding that Plaintiff had moderate pain, he confirmed at the *Daubert* hearing that Dr. Gluck had noted, at his last appointment, Plaintiff "had no complaints of pain" and a "completely normal exam of the leg." *Id.* at 49:14-20 ("Q: And according to Dr. Gluck's notes, the last time [Plaintiff] saw Dr. Gluck four months after the accident, [Plaintiff] had no

---

[7] After the Court issued its ruling excluding Dr. Garzillo's testimony, Plaintiff's counsel asked, "so are you saying that he cannot testify at all or he cannot testify as to money?" Daubert Tr. at 58:15-17. The Court clarified that it understood Plaintiff offered Dr. Garzillo as an expert as to future medical expenses only, and that he had not examined the Plaintiff. *Id.* at 58:18-59:5 Plaintiff's counsel never offered any other basis for which she was proffering Dr. Garzillo as an expert. *Id.* Moreover, Dr. Garzillo's expert report was specifically limited to future medical expenses. *See* Exhibit A. Accordingly, with no other basis for his testimony, Dr. Garzillo was excluded from testifying at trial.

complaints of pain, right? A: That's correct. Q: [Plaintiff] had a completely normal exam of the leg, correct? A: That's correct."). Dr. Garzillo also testified that neither of Plaintiff's treating doctors had indicated that Plaintiff may have a permanent condition requiring future treatment. *Id.* at 53:15-20 ("Q: [Plaintiff] has been treated by the two orthopedic surgeons, as I discussed, and neither one of those surgeons ever gave any indication at all in their medical records that [Plaintiff] was going to have any type of permanent problem or require any future treatment, right? A: They do not address it in their records, correct.").

Moreover, Dr. Garzillo's experience and chosen sources highlight the importance of in-person examinations to assess pain. He testified that "Chiropractic by nature is a very hands-on approach to treatment." Daubert Tr. at 9:10-11. In addition, one of the studies Dr. Garzillo relied upon provides:

> [T]he chronic pain experience is shaped by a myriad of biomedical, psychosocial (e.g. patients' beliefs, expectations, and mood), and behavioural factors (e.g. context, responses by signficant others). Assessing each of these three domains through a comprehensive evaluation of the person with chronic pain is essential for treatment decisions and to facilitate optimal outcomes. This evaluation should include a thorough patient history and medical evaluation and a brief screening interview where the patient's behaviour can be observed.

ECF 96 at 1. A physical evaluation, "essential" for pain treatment decisions, was never performed by Dr. Garzillo. Accordingly, the lack of sufficient facts or data underlying Dr. Garzillo's opinions render them excludable. *See Young v. Swiney*, 23 F. Supp. 3d 596, 612 ("a court will exclude testimony based on 'belief or speculation,' ... or when not supported by the record") (quoting *Oglesby*, 190 F.3d at 250) (citations omitted); *Holesapple*, 5 F. App'x at 180 (requiring expert opinion evidence to be supported "by something more than the 'it is so because I say it is so' of the expert"); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)

15

(concluding that, under *Daubert*, an expert opinion based on "[his] qualifications, [his] conclusions, and [his] assurances of reliability ... [is] not enough.").

## IV. CONCLUSION

For the reasons set forth above and stated on the record at the *Daubert* hearing on May 20, 2019, Defendant's first Motion in Limine, ECF 83, is granted and Defendant's second Motion in Limine, ECF 98, is denied as untimely.


Dated: June 4, 2019                                    /s/
                                                       Stephanie A. Gallagher
                                                       United States Magistrate Judge